IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JODY DELL WELSH, | ) | 4:13CV3187 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

In this social security appeal, plaintiff Jody Dell Welsh ("Welsh") argues that the Commissioner of Social Security committed reversible error in determining that she is not entitled to disability insurance and supplemental security income benefits. For the reasons discussed below, the Commissioner's decision is affirmed.

## I.  BACKGROUND

On October 11, 2010, Welsh filed applications for disability insurance and supplemental security income benefits.  (Tr. 9.)  In her applications, Welsh alleged that she has been disabled since June 1, 2003.  (*Id*.)  Welsh's claims were denied initially and on reconsideration.  (*Id*.) On August 6, 2012, an administrative law judge ("ALJ") issued a decision finding that Welsh was not disabled under sections 216(i) and 223(d) of the Social Security Act.  (Tr. 9-24.)  In his decision, the ALJ followed the five-step sequential analysis prescribed by the Social Security Regulations to

evaluate Welsh's claims.[1]  *See* [20 C.F.R. §§ 404.1520](), [416.920]().  The ALJ found as follows:

1.  The claimant meets the insured status requirements of the Social Security Act through June 30, 2015.

2.  The claimant has not engaged in substantial gainful activity since October 20, 2005, the day after the prior Administrative Law Judge decision (20 CFR 404.1571 *et seq*. and 416.971 *et seq*.).

3.  The claimant has the following severe impairments: obesity, degenerative disc disease of the cervical spine, degenerative disc disease of the lumbar spine, an affective disorder and an anxiety disorder (20 CFR 202.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR

---

[1]The Social Security Administration uses a five-step process to determine whether a claimant is disabled.  These steps are described as follows:

At the first step, the claimant must establish that he has not engaged in substantial gainful activity. The second step requires that the claimant prove he has a severe impairment that significantly limits his physical or mental ability to perform basic work activities. If, at the third step, the claimant shows that his impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits. If the claimant cannot carry this burden, however, step four requires that the claimant prove he lacks the [residual functional capacity] to perform his past relevant work. Finally, if the claimant establishes that he cannot perform his past relevant work, the burden shifts to the Commissioner at the fifth step to prove that there are other jobs in the national economy that the claimant can perform.

*Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006).

404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), in that she can lift and carry twenty pounds occasionally and ten pounds frequently. The claimant can stand or walk for six hours in an eight-hour day and sit for six hours in an eight-hour day.  She may occasionally climb stairs, but she is unable to climb ropes, scaffolds or ladders.  Additionally, the claimant remains able to occasionally balance, stoop, crouch, kneel and crawl.  However, she must avoid prolonged exposure to vibrating machinery and avoid all exposure to unprotected heights and hazardous machinery.  Mentally, the claimant would be limited to simple tasks and jobs that do not demand attention to detail or complicated job tasks or instructions.  Additionally, the claimant can work in proximity to others, but she would require work that does not involve close cooperation and interaction with co-workers in that the claimant would work best in relative isolation.  She is limited to occasional interaction and cooperation with the general public.  The undersigned finds that the claimant is able to maintain attention and concentration for a minimum of two-hour periods, accept supervision on a basic level and adapt to changes in the workplace on a basic level.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on May 21, 1960[,] and was 45 years old, which is defined as a younger individual age 18-49, on October 20, 2005, the day after the prior Administrative Law Judge decision.  The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

3

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under disability, as defined by the Social Security Act, from October 20, 2005, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 1-24.) After the ALJ issued his decision, Welsh filed a request for a review with the Appeals Council of the Social Security Administration. (Tr. 6.) On September 28, 2013, the Appeals Council denied Welsh's request for review. (Tr. 1-4) Thus, the ALJ's decision stands as the final decision of the Commissioner of Social Security.

## II. STANDARD OF REVIEW

A denial of benefits by the Commissioner is reviewed to determine whether the denial is supported by substantial evidence on the record as a whole. *Hogan v. Apfel*, 239 F.3d 958, 960 (8th Cir. 2001). "Substantial evidence" is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. *Id.* at 960-61; *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000). Evidence that both supports and detracts from the Commissioner's decision must be considered, but the decision may not be reversed merely because substantial evidence supports a contrary outcome. *See Moad v. Massanari*, 260 F.3d 887, 890 (8th Cir. 2001).

This court must also review the decision of the Commissioner to decide whether the proper legal standard was applied in reaching the result. *Smith v.*

4

*Sullivan*, 982 F.2d 308, 311 (8th Cir. 1992).  Issues of law are reviewed de novo. *Olson v. Apfel*, 170 F.3d 820, 822 (8th Cir. 1999); *Boock v. Shalala*, 48 F.3d 348, 351 n.2 (8th Cir. 1995).

## III.  DISCUSSION

### A.    Relevant Medical History and Opinions

Welsh's impairments are "bipolar 2," depression, anxiety, chronic back pain, a sleep disorder, and arthritis in her right elbow and knee.  (Tr. 213, 247.)  As of October 20, 2005, Welsh was 45, had a general equivalency diploma, and past relevant work experience as a telephone solicitor, cleaner, cook helper, and childcare center worker.  (Tr. 21, 141, 148, 214, 259, 262-63.)  Medical records from before October 2005, through June 14, 2010, show that Welsh either visited or contacted Cleve Hartman, M.D. ("Hartman"), with complaints of back and neck pain.  (Tr. 316-40.)  During this time, Hartman made objective examination findings and regularly renewed Welsh's prescription for Hydrocodone.  (Tr. 316-40.)  Welsh also attended five sessions of physical therapy from February 24, 2005, through March 24, 2005.  (Tr. 476.)  Although she had mild hypertonicity across the brachium and pain in her neck and upper back associated with cranial rotation, Welsh could maintain a neutral C2 position and neutral pelvic position, and she could flatten her back without initiating paraspinal muscle spasms.  (Tr. 460, 476.)

On August 23, 2005, Dr. Tamara R. Johnson ("Johnson"), examined Welsh for complaints of depression.  (Tr. 370-71.)  Johnson noted that she had not seen Welsh since August 2003, at which time Welsh stopped treating with her because Welsh felt that she did not need antidepressant medication anymore.  (Tr. 370.)  Johnson noted that Welsh was taking Cymbalta, which had been prescribed by Hartman and was helping her depression and back pain.  (*Id*.)  Johnson further noted that Welsh was a recovering addict and that she needed to be mindful of not using medications that are addictive.  (*Id*.)  Welsh was cooperative, thoughtful, pleasant, and smiling, her

5

grooming was appropriate, and her mental status was within normal limits.  (*Id*.)
Johnson diagnosed depression and anxiety.  (*Id*.)  She prescribed Buspar because she
did not want to prescribe anything addictive.  (Tr. 371.)  Overall, Johnson found
Welsh to be "pretty stable."  (*Id*.)

On September 12, 2005, less than a month after being prescribed Buspar,
Welsh's therapist, Teresa Rudnick, M.A. ("Rudnick"), wrote that Plaintiff had stopped
taking Buspar because it was making her feel nauseated and like she "couldn't think."
(Tr. 427.)   Instead, Welsh stated that she was practicing deep breathing and
meditation, and that she felt like she was ready for discharge from counseling.  (*Id*.)

On November 23, 2005, Tim J. Watt, M.D. ("Watt"), examined Welsh for
complaints of neck and back pain.  (Tr. 298-303.)  Welsh stated that her pain had
started in February 2000 following a motor vehicle accident or a work-related
accident, but that she had not lost any sleep or missed any work as a result.  (Tr. 298-
99.)  Welsh also indicated that physical therapy was aggravating, so she stopped, and
that chiropractic therapy, although helpful for her back, was aggravating for her neck.
(*Id*.)   Watt's examination revealed that Welsh was oriented, well-developed, and
well-nourished.  (Tr. 300-02.)  She had no acute distress, her memory was intact,
concentration was normal, speech was fluent, language was appropriate, and she had
full range of motion in her extremities without pain, tenderness, or crepitation.  (*Id*.)
She also had full range of motion in her back with essentially normal sensation, and
no tenderness in the cervical, lumbar, or thoracic spine.  (Tr. 301.)  Plaintiff could
ambulate on her heels and toes normally.  (Tr. 302.)  Magnetic resonance imaging
("MRI") showed some mild disc bulging in the lumbar spine and very mild
degenerative changes at C5-6 and C6-7, but no nerve root impingement.  (Tr. 302,
305-07, 498-99.)  Watt diagnosed mechanical back and neck pain and recommended
physical therapy and an epidural injection.  (Tr. 298, 303).

That same day, Welsh visited Johnson for a follow-up.  (Tr. 369.)  During the
appointment, Welsh indicated that although she had just started taking Cymbalta, she

had decided to quit because it made her feel "real tired and sedated." (*Id*.) Johnson noted that Welsh was calm and cheerful, her affect was good, her thinking was clear and linear, and she did not show any manic signs. (*Id*.) Johnson diagnosed depression and possible bipolar anxiety. (*Id*.) Johnson prescribed Risperdal, noted that Welsh was taking Lunesta and Zetia, and wrote that Welsh could not be prescribed traditional Benzodiazepines because she had an addiction problem. (*Id*.)

On December 22, 2005, Welsh followed up with Johnson and reported that the Risperdal made her feel drunk and that Lunesta was causing a bad taste in her mouth. (Tr. 368.) Johnson switched Welsh's medication to Lamictal and Ambien. (*Id*.)

On January 19, 2006, Welsh followed up with Watt, reporting that her back pain was "pretty much resolved," but that her neck was still bothering her. (Tr. 297.) Welsh reported that she had not participated in physical therapy nor taken an epdidural since Watt had last seen her. (*Id*.) Watt's exam was "unchanged"; he again recommended physical therapy and encouraged Welsh to get the epidural. (*Id*.) That same day Welsh underwent an MRI of her cervical spine which revealed degenerative disc disease from C4 through C6 with very minimal two-millimeter spondylolisthesis at C4-5 resolved on extension. (Tr. 304, 497.)

On February 1, 2006, Welsh contacted Johnson and said that she could not tolerate Lamictal because it made her manic and angry. (Tr. 367.) Johnson decided to try Eskalith instead, but warned Welsh about weight gain as a side effect. (*Id*.)

On March 23, 2006, Welsh followed up with Johnson and told her that she never started Eskalith because someone told her it would make her teeth rot and cause brain damage. (Tr. 366.) However, after Johnson reviewed the possible side effects of Eskalith with Welsh, she agreed to try it. (*Id*.)

On June 20, 2006, Plaintiff followed up with Johnson and stated that she stopped taking Eskalith after about five weeks because it made her feel more irritable and edgy. (Tr. 365.) Johnson switched gears and prescribed Celexa. (*Id*.)

On August 17, 2006, Plaintiff followed up with Johnson and stated that she had not started taking Celexa because she was concerned it would cause diarrhea. (Tr. 364.) Johnson assured her that the risk of diarrhea was low, and Welsh agreed to start taking it. (Tr. 364.)

On October 2, 2006, Welsh went to the emergency department with complaints of swelling and mild pain in her left leg. (Tr. 492-96.) James E. Smith, M.D. ("Smith"), noted that her head was atraumatic and her neck and back were normal. (*Id*.) Smith diagnosed Welsh with a left-leg superficial thrombophlebitis and instructed her to apply ice and take Motrin. (Tr. 493.)

On October 10, 2006, Welsh followed up with Johnson. (Tr. 363.) At the follow-up, Welsh stated that she had stopped taking Celexa because it had caused headaches and nausea. (*Id*.) She also said that she was feeling depressed and had been struggling with a lack of motivation. (*Id*.) Johnson decided to try a different class of medicine in the form of Wellburtrin. (*Id*.)

On November 28, 2010, Welsh followed up with Johnson, informed her that the Wellbutrin had caused side effects, and asked if she could try Cymbalta again. (Tr. 362.) Johnson agreed, prescribed Cymbalta and indicated she would see her again in six to seven weeks. (*Id*.)

Seven months later, on May 23, 2007, Welsh returned to Johnson. (Tr. 361.) Welsh indicated that she had tried Cymbalta for approximately three weeks, but quit taking it because she thought it failed to improve the fatigue she was feeling. (*Id*.) Johnson noted that Welsh had tried multiple medications and that she "just [would] not stay on them because she says they all give her side effects." (*Id*.) However,

Johnson doubted whether Welsh had really given any of the medications a try. (*Id*.) Johnson prescribed Lexapro and Geodon. (Tr. 361.)

On June 27, 2007, Plaintiff followed up with Johnson. (Tr. 360.) Welsh indicated she was finally starting to see some improvement because her fatigue was going away and she was not crying anymore. (*Id*.) Welsh was more cheerful and her thoughts were clear and focused. (*Id*.) Johnson continued Welsh's Lexapro prescription and noted that her bipolar disorder was improving from a depression standpoint. (*Id*.)

During follow up appointments in August and November 2007, Welsh continued to show improvement, but reported she needed a little more "oomph." (Tr. 358-59.) Johnson decided to increase her Lexapro dose. (Tr. 358.)

On January 30, 2008, Welsh followed up with Johnson and indicated that the increased dose of Lexapro had caused her to feel jittery and hyper. (Tr. 357.) However, she also reported that she was starting to realize that her fatigue was because of her two-year-old granddaughter, for whom she was the primary guardian and caregiver. (*Id*.) Johnson noted that Welsh was nicely groomed and dressed, her thoughts were clear and appropriate, and that Welsh seemed to be doing quite well. (*Id*.) Johnson continued Welsh's Lexapro dose and told her to follow up in six months. (*Id*.)

On August 21, 2008, Welsh followed up with Johnson, informing her that she no longer wanted to continue Lexapro because it did not really help. (Tr. 356.) Johnson switched Welsh's prescription to Invega. (Tr. 356.)

On August 3, 2010, Plaintiff returned to Hartman complaining of neck pain and chronic back pain. (Tr. 316.) She requested an increased dose of Hydrocodone. (*Id*.) Hartman noted that although a 2005 lumbosacral spine MRI showed mild facet degenerative changes, hypertrophy, and diffuse disc bulging, Welsh could bend over

9

and touch her toes, ambulate without difficulty, and had good strength and reflexes (*Id.*)  He ordered a repeat MRI, which showed mild to moderate facet degeneration with no stenosis.  He also renewed Welsh's Hydrocodone prescription without increasing the dose. (Tr. 316-17.)

On October 21, 2010, Welsh completed a Work Activity Report in connection with her applications. (Tr. 197-02.)  She wrote that she was currently working as a telemarketer 10 hours a week. (Tr. 198.)  She also said that she used to work 25 hours a week, but that her hours had steadily been decreased since 2006 for reasons unrelated to her medical condition. (Tr. 198.)

On November 1, 2010, Plaintiff completed a Disability Report.  (Tr. 212-18.) She said that her work had changed as a result of her medical condition. (Tr. 213.)

On November 15, 2010, Welsh completed a disability questionnaire.  (Tr. 219-23.)  She wrote that she did not participate in any social activities because of her anxiety. (Tr. 219.)  She indicated that she showered, swept her porch and watered her flowers only once a week.  (*Id.*)  She reported that she only prepared meals that did not require her to stand too long and that her daughter had moved in with her to help her with chores. (Tr. 219-20.)  Welsh wrote that she ran her own errands and assisted with the supervision of her daughter's two children. (Tr. 220-21.)  Welsh reported that she did not nap during the day and that she was not taking any medication for depression. (Tr. 221.)

Between November 2010 and July 2011, Welsh's daughters, sister, and friend wrote statements that rehashed her disability report.  (Tr. 225-27, 253-54, 255-56, 257-58, 291-92).

On January 6, 2011, Welsh visited Johnson. (Tr. 343.)  During her visit, Welsh apologized to Johnson for not following up since August 2008.  (*Id.*)  Welsh stated that she had not been back since 2008 because her medication did not seem like it was

helping. (Tr. 343, 354.) However, Welsh decided to return because she was struggling to support her daughter and her daughter's three children. (Tr. 343-44, 354-55.) Johnson diagnosed bipolar disorder, "lots of anxiety," and physical problems. (Tr. 343, 354.) Johnson provided Welsh samples of Symbyax and informed her of potential side effects. (*Id*.)

On January 13, 2011, Hartman examined Welsh for complaints of right knee and right elbow pain. (Tr. 410.) X-rays showed no acute "bony findings" and minimal degenerative joint disease. (Tr. 348-49, 410.) Hartman encouraged Welsh to take Ibuprofen and told her to rest, use ice, and elevate her right knee. (Tr. 410.) Between December 8, 2010, and March 4, 2011, Dr. Hartman renewed Welsh's Hydrocodone prescription without examination. (Tr. 409, 411.)

On February 9, 2011, Welsh followed up with Johnson. (Tr. 353, 426.) Welsh was "a lot calmer," "didn't look nearly as haggard," and laughed with her granddaughter, whom she had brought with her to the appointment. (*Id*.) Johnson increased Welsh's Symbyax and noted that she was improving. (*Id*.)

On February 15, 2011, Christopher Milne, Ph.D. ("Milne"), completed a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment. (Tr. 375-77, 380-92.) Milne concluded Welsh was moderately impaired in attention/concentration due to some racing thoughts. (Tr. 377.) He also found Welsh to show difficulty with socialization due to some anxiety, but this difficulty was only moderate. (*Id*.)

The following day, general practitioner Glen Knosp, M.D. ("Knosp"), completed a Physical Residual Functional Capacity Assessment. (Tr. 394-401.) Knosp concluded that Plaintiff could lift 50 pounds occasionally and 25 pounds frequently; sit about 6 hours and stand and/or walk about 6 hours in an 8-hour work day; crawl and climb ramps, stairs, ladders, ropes, and scaffolds occasionally; and that

Welsh should avoid concentrated exposure to vibration and hazards, such as machinery and heights.  (Tr. 395-96, 398.)

On March 23, 2011, three opinions were completed regarding Welsh's impairments.  Patricia Newman, Ph.D. ("Newman"), opined in a Psychiatric Review Technique that Welsh did not have any marked psychological limitations.  (Tr. 415.) Internist Jerry Reed, M.D. ("Reed"), opined in a Physical Residual Functional Capacity Assessment that Welsh's spine did not meet or equal any of the Commissioner's listing of disabling impairments, and that she could perform the range of work identified by Knosp.   (Tr. 417-18.)

In addition, Johnson completed an attorney-supplied Mental Impairment Questionnaire.  (Tr. 404-07.)  In the questionnaire, Johnson wrote that Welsh had a current and highest Global Assessment of Functioning (GAF) score of 48.[2]  (Tr. 404.) Johnson described Welsh's impairments and symptoms as: haggard, tearful affect, cries easily, irritable, mind racing, anxiety, cannot calm herself, disrupted sleep cycle, and looks visibly distressed.  (Tr. 404.)  Johnson opined that Welsh had marked restriction in activities of daily living and extreme difficulty maintaining social functioning and concentration, persistence, or pace, and that she had experienced four or more episodes of decompensation.  (Tr. 406.)

On April 13, 2011, Welsh followed up with Johnson.  (Tr. 425, 592.)  She reported that her anxiety and sleep were "a little better," but that she was

---

[2]"The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning 'on a hypothetical continuum of mental health-illness.'"  *Halverson v. Astrue*, 600 F.3d 922, 925 n.4 (8th Cir. 2010) (quoting *American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders*, 32–34 (4th ed. 2000) (DSM–IV)).  GAF scores at 50 or below, taken as a whole, demonstrate that a claimant has serious symptoms or serious impairment in social, occupational, or school functioning.  *Id*. at 931 (citing *Pate-Fires v. Astrue*, 564 F.3d 935, 944 (8th Cir. 2009)).

overwhelmed by her poor financial status. (Tr. 425, 592.) Johnson increased Welsh's Symbyax dose. (Tr. 425, 592.)

On July 7, 2011, Hartman completed a General Questionnaire about Welsh's impairments. (Tr. 419-23.)   He reported that Welsh had depression, anxiety, panic attacks, blurry vision, fatigue, arm pain, and chronic low back pain. (Tr. 419-20.) He also reported she could sit less than two hours and stand/walk less than two hours in an eight-hour workday, walk one block at a time, lift up to 10 pounds occasionally, could not perform low-stress work, needed to be able to switch positions at will, and likely would be absent from work four times a month due to her impairments. (Tr. 420-23.)

On July 26, 2011, Welsh followed up with Johnson and reported that although she was really stressed by financial things, she was doing "quite good." (Tr. 424, 591.) Johnson decided to maintain her Symbyax dose. (Tr. 424, 591.)

On January 27, 2012, Welsh visited Hartman for a six month "recheck" and complained of foot and low back pain. (Tr. 448.) Hartman's examination showed no swelling, redness, or deformities in Welsh's foot and she had good range of motion in her back. (Tr. 448.) Hartman also refilled Welsh's Hydrocodone prescription. (Tr. 448-51.)

On June 16, 2012, Welsh responded to interrogatories about her impairments. (Tr. 265-73.) She said that her mind raced and that she had a hard time concentrating (Tr. 266.) She also said that her medication made her very tired and fatigued, and that she had back pain, neck pain, and headaches. (Tr. 266-67.) Welsh wrote that she could stand only 15 minutes, walk only 10 minutes, and sit for a total of 3 hours each in an 8-hour day. (Tr. 270.) She also said that her daughter performed most of the household chores. (Tr. 272.)

On July 12, 2012, Hartman completed a General (Physical) Questionnaire about Welsh's impairments. (Tr. 595-98.) Hartman reported Welsh had bipolar disorder, depression, anxiety, degenerative disc disease, and degenerative joint disease. (Tr. 595.) He also reported that she could sit and stand/walk less than two hours each in an 8-hour workday, would need to take fifteen 24-minute breaks per day, would be off-task at least 25 percent of the day, and would miss more than four days of work per month due to her impairments. (Tr. 596, 598.)

## B.      Hearing Testimony

On July 25, 2012, a hearing was held before an ALJ. (Tr. 33.) At the hearing, Welsh testified that she was disabled because of stress, anxiety attacks, fatigue, trouble concentrating, lack of a social life, back pain, and a bowel problem. (Tr. 38-39, 41, 43-46.) Welsh testified that she struggled to go to the bank, her daughter did the "cooking and the shopping," and her daughter bathed Welsh's six-year-old granddaughter. (Tr. 36, 41-42.) Regarding the challenges that she faced with her back condition, Welsh testified that she could not sit for long periods of time, she had to take Hydrocodone, and she needed to lie down on a heating pad every three hours. (Tr. 43.) Welsh also testified that she did not really do anything around the house and could not do much for her granddaughter. (Tr. 46.)

With regard to work, Welsh testified that she worked as a telemarketer two to three hours a day, three to four days a week. (Tr. 37.) She also testified that she could drive to work without a problem and that her medication helped with her back pain. (Tr. 36, 45.)

After Welsh testified, the ALJ asked the vocational expert to consider a hypothetical individual of Welsh's age, education, and work history. (Tr. 55.) The individual could lift 20 pounds occasionally and 10 pounds frequently; walk, stand, or sit six of eight hours; occasionally climb stairs, balance, stoop, kneel, crouch, and crawl; should never climb ropes, ladders, or scaffolds; and would need to avoid

14

prolonged exposure to vibrating machinery, unprotected heights, and hazardous moving machinery. (Tr. 55-56.) The hypothetical individual could maintain attention and concentration for a minimum of two-hour periods at a time. (Tr. 56.) She would adapt to the workplace and accept supervision at the basic level. (*Id.*) Accordingly, she would be limited to jobs that do not demand attention to details, complicated instructions, or job tasks. (*Id.*) She would work better in relative isolation, should be limited to only occasional interaction and cooperation with the general public, and could not perform jobs that demanded attention to detail, close cooperation or interaction with coworkers. (*Id.*)

The vocational expert testified that the hypothetical individual could not perform her past relevant work, but could perform other work in the economy as a router (240 Nebraska jobs; 68,000 national jobs), collator operator (400 Nebraska jobs; 36,310 national jobs), and inserting machine operator (270 Nebraska jobs; 43,215 national jobs). (Tr. 56-57.)

## C.    Welsh's Arguments on Appeal

In her appeal brief, Welsh argues that the ALJ's opinion is not supported by substantial evidence because the ALJ (1) improperly discredited Welsh's credibility, (2) failed to provide proper reasons for discrediting the statements of "other sources," (3) improperly discredited the opinions of Welsh's treating physicians, (4) improperly determined that Welsh's condition did not meet the criteria for listing 12.04, and (5) used an incorrect standard at step five of his disability analysis to determine that Welsh had the residual functional capacity ("RFC") to perform work as a router, collator operator, or inserting machine operator. (Filing 14 at CM/ECF pp. 4-21.) The Commissioner contends that the ALJ's decision is supported by substantial evidence. (Filing 22 at CM/ECF pp. 9-19.) I agree with the Commissioner.

*1.      Welsh's Credibility*

Welsh argues that the ALJ erred in discounting her credibility. (Filing 14 at CM/ECF pp. 5-10.) In particular, Welsh disagrees with the ALJ's findings regarding her daily living activity testimony, her testimony regarding medication side effects, and her failure to seek treatment. (*Id*.) I will briefly address each of these disagreements.

a.      Daily Living Activity Testimony

Welsh testified that her daily living activities were severely limited, that is, she did not really do anything around the house and could not do much for her granddaughter. (Tr. 17, 46.) The ALJ concluded that the record contradicted this testimony. (Tr. 17.) In doing so, he pointed to evidence showing that Welsh cooked meals, performed chores, and was the primary caregiver for her granddaughter. (*Id*.; *see also* Tr. 219-23.) An ALJ may properly discount a claimant's testimony where it is inconsistent with the record. *Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004); *see also Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (concluding grocery shopping, driving, and daily child care were inconsistent with claims of disabling pain); *Walker v. Shalala*, 993, F.2d 630, 631-32 (8th Cir. 1993) (finding daily activities of driving, cooking and washing dishes inconsistent with claims of disabling pain).

b.      Testimony Regarding Side Effects

In his opinion, the ALJ noted that Welsh had reported vague side effects of fatigue and drowsiness from her medications, but that she did not indicate which medications were responsible. (Tr. 17.) Welsh argues her reports of side effects should not have been used to discredit her because she was taking a wide variety of medications and "it is understandable that she was not specific" about which ones were causing side effects. (Filing 14 at CM/ECF p. 22.) However, the ALJ also cited

Johnson's medical notes, which indicated that many of Welsh's reported side effects were unwarranted, that Welsh did not actually experience them, and that she was merely convinced they would occur. (Tr. 19.) Indeed, Johnson doubted whether Welsh had really given any of the medications a try. (Tr. 361.) Further, Welsh reported that "a lot" of her fatigue was the result of providing care for her granddaughter. (Tr. 357.) Again, an ALJ may properly discount a claimant's testimony where it is inconsistent with the record. *Eichelberger*, 390 F.3d at 590.

    c.  Failure to Seek Treatment

   The ALJ also found that Welsh took extensive pain medications for her back pain, but beyond a brief period of physical therapy, failed to follow through with recommended physical therapy and otherwise showed minimal effort to relieve her pain. (Tr. 16; *see also* Tr. 297-98, 303.) Based on this evidence, and the overall evidence, the ALJ concluded Welsh's symptoms were not as severe as alleged. (Tr. 16.) Indeed, "failure to follow a recommended course of treatment [] weighs against a claimant's credibility." *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005).

   Welsh argues the ALJ erred in discrediting her for failing to pursue treatment. (Filing 14 at CM/ECF pp. 8-10.) Although she made progress with her back during her initial participation in physical therapy, the record shows that it aggravated her neck. (Tr. 16; *see also* 298-99, 460, 476.) Welsh argues this neck pain made it illogical for her to continue physical therapy. (Filing 23 at CM/ECF p. 6.) To some extent, the record provides an explanation for Welsh's failure to continue physical therapy. However, other substantial evidence in the record as a whole supports the ALJ's credibility determination. The ALJ clearly analyzed the inconsistent testimony discussed above and considered, among other things, Welsh's poor work history, frequent early refill requests for pain medications, history of substance abuse, request for an increase in pain medication during a normal physical exam, part-time work history, and lack of emergency room or urgent care visits for back pain. (Tr. 16-19.)

*See also Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001) ("A lack of work history may indicate a lack of motivation of work rather than a lack of ability.")

In short, the ALJ evaluated Welsh's statements based on the requirements of several regulations and social security rulings, including SSR 96-7p, and concluded her complaints regarding the intensity, persistence and limiting effects of her symptoms were not credible to the extent that they were inconsistent with his RFC determination. (Tr. 16.) Substantial evidence in the record as a whole supports this credibility assessment.

### 2.    *Discounting Other Sources*

Welsh argues that the ALJ did not appear to consider the opinions of Welsh's daughters, sister, and friend. (Filing 14 at CM/ECF p. 20-21.) Welsh believes the case should be remanded to give the opinions of these "other sources" proper weight. (*Id.*) However, the ALJ did consider these opinions and noted they were identical to Welsh's subjective testimony and "therefore cumulative." (Tr. 21.) As such, the ALJ was entitled to discount these opinions for the same reasons he found Welsh's testimony only partially credible. (*Id.*) *See also Black v. Apfel*, 143 F.3d 383, 387 (8th Cir. 1998) ("Black's parents['] . . . testimony merely corroborated Black's testimony regarding her activities. The ALJ, having properly discredited Black's complaints of pain, was equally empowered to reject the cumulative testimony of her parents.").

### 3.    *Treating Physicians' Opinions*

Welsh argues the ALJ improperly discredited the opinions of her treating physicians, Hartman and Johnson. (Filing 14 at CM/ECF pp. 15-19.)

"It is the ALJ's function to resolve conflicts among the various treating and examining physicians." *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) (internal quotation marks omitted). While "a treating physician's opinion is generally entitled

18

to substantial weight, that opinion does not 'automatically control' in the face of other credible evidence on the record that detracts from that opinion." *Heino v. Astrue*, 578 F.3d 873, 880 (8th Cir. 2009); *see also Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) (holding that a treating physician's opinion is given controlling weight "if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence").  Indeed, "[a]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (internal quotation marks omitted).  However, "[w]hen an ALJ discounts a treating physician's opinion he should give 'good reasons' for doing so." *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007)

In determining Welsh's residual functional capacity, the ALJ reviewed, among other things, opinions from Hartman, Watt, Johnson, Smith, Milne, Knosp, Newman, and Reed.  (Tr. 15-21.)  After reviewing these opinions, and with regard to Welsh's physical limitations, the ALJ gave "significant weight" to the opinions of Knosp (tr. 394-402) and Reed (tr. 417-18).  He concluded these opinions were consistent with the opinions of Watt and Hartman (tr. 297-342, 447-453).  However, he gave "no weight" to Hartman's multiple statements that Welsh could not even perform a limited range of sedentary work (tr. 419-23, 595-98).  The ALJ provided several reasons for discounting Hartman's statements:

> First, these opinions are not supported by Dr. Hartman's own progress notes. As noted in detail above, Dr. Hartman made no findings of neurological dysfunction and he regularly found the claimant to have preserved range of motion in the lumbar and cervical spines [(tr. 316-342, 447-453)].  Furthermore, Dr. Hartman's opinions are not supported by the relatively mild objective findings as noted on repeated x-ray and MRI scans and detailed extensively above.  Finally, Dr. Hartman opined that the claimant could not sit for more than two hours a day, yet the

> claimant currently works a part-time job, sitting for two to three hours
> a shift.

(Tr. 18.)  Indeed, Hartman's own examination findings show that Welsh could bend over and touch her toes, ambulate without difficulty, and had good strength and reflexes.  (Tr. 316.)  These treatment notes are supported by other opinions in the record, including Watt's conclusion that Welsh had full range of motion in her back with essentially normal sensation, and no tenderness in the cervical, lumbar, or thoracic spine, and normal ambulation (tr. 301-02); Knosp's opinion that Welsh could perform a range of medium work (tr. 395); and Reed's opinion that Knosp's findings regarding Welsh's limitations were consistent with the record (tr. 417-18).  Further, Welsh self-reported that she could sit for a total of 3 hours each in an 8-hour day.  (Tr. 270.)  This conflicts with Hartman's reports that she could sit less than two hours and stand/walk less than two hours in an eight-hour workday.  (Tr. 419-23, 596, 598.)

Although the record shows that Welsh has back impairments, substantial evidence on the record as a whole suggests that these impairments were not as disabling as Hartman reported in his General Questionnaires.  *See Perkins v. Astrue,* 648 F.3d 892, 899, (8th Cir. 2011) (quoting *Davidson v. Astrue,* 578 F.3d 838, 843 (8th Cir. 2009)* ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes"); *See* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) (providing that the ALJ should consider the extent to which a doctor's opinion is supported by objective evidence); *Renstrom v. Astrue,* 680 F.3d 1057, 1064-65 (8th Cir. 2012) ("the ALJ [properly] found Dr. Agre's opinion was not consistent with the other medical experts, who determined Renstrom could perform light work within a modified RFC"); *Estes v. Barnhart¸* 275 F.3d 722, 725 (8th Cir. 2002) (an ALJ may reject any medical expert opinion that is inconsistent with the record as a whole).

With regard to Welsh's mental health, the ALJ gave "significant weight" to the opinions of Milne (tr. 375-93) and Newman (tr. 415-16).  However, he gave "no

20

weight" to Johnson's statements in a February 23, 2011, Medical Impairment Questionnaire (tr. 404-08) and Hartman's statements in a July 7, 2011, General Questionnaire (tr. 419-23).   The ALJ explained his reasons for discounting these opinions as follows:

> Both sources opined that the claimant would have extreme and marked limitations in several areas of mental functioning.   However, these opinions are not supported by the medical evidence of record.   As noted extensively above, Dr. Johnson's records reflect the claimant's moods are well controlled on medications [(Tr. 353-74, 591-94)].   Dr. Hartman's records contain no detailed examination findings related to psychiatric symptoms.   Additionally, the undersigned notes that Dr. Johnson completed her form after the claimant had been absent for treatment for almost three years and after only resuming treatment for two visits.   Indeed, Dr. Johnson's subsequent progress note reflect that the initiation of Symbyax provided substantial relief in the claimants symptoms [(Tr. 591-94)].   In addition, they are not supported by the claimant's activities of daily living including maintaining a household and caring for a 6-year-old.   It is impossible to reconcile the fact that the state child welfare officials would repeatedly place small children in her care, if she were as limited as described.

(Tr. 21.)   Welsh argues that the ALJ erred in rejecting Johnson's opinion because it was supported by the GAF score assessments assigned to her by Great Plains Regional Medical Center.   (Filing 14 at CM/ECF p. 18; Filing 23 at CM/ECF p. 3.)   Welsh states that "it does not appear that the ALJ considered these GAF scores in making his determination as they are not mentioned in the opinion."   (Filing 14 at CM/ECF p. 18.)

Although the Commissioner has declined to endorse the GAF scale for use in Social Security and SSI disability programs, the ALJ was not precluded from considering it.   *See Halverson*, 600 F.3d 930-31.   Moreover, the ALJ's failure to specifically mention a GAF score in his opinion does not mean that he did not consider it.   *See Black*, 143 F.3d at 386 (8th Cir. 1998) (internal citations omitted)

("[a]lthough required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted . . . [and][a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered").  Indeed, the ALJ discussed Johnson's Medical Impairment Questionnaire, which included Johnson's assessment that Welsh's highest and current GAF was 48.  *See also Bradley v. Astrue, 528 F.3d 1113, 1115 n.3 (8th Cir. 2008)* (concluding where the claimant contended the ALJ erred by failing to consider his GAF score, the ALJ necessarily considered it where the GAF score was part of a physician's assessment that was considered with the overall evidence).

Welsh also argues that the ALJ incorrectly viewed Hartman and Johnson's mental "treatment notes in a light for which they were not intended." (Filing 14 at CM/ECF p. 19.)  Although these notes show Welsh was "a lot calmer," "improving," and doing "quite good" on her medications, Welsh asserts her progress had "no relation" to her functional capacity. (*Id*.; Tr. 353, 424, 426, 591.)  Using this logic, Welsh suggests that the ALJ erred in discrediting Johnson's opinion for the inconsistencies between her treatment notes and her answers in the Mental Impairment Questionnaire. (Filing 14 at CM/ECF p. 19; *see also* Tr. 353, 404-07, 424, 426, 591.)

Contrary to Welsh's argument, an ALJ may consider a physician's treatment notes in assessing the physician's opinions. *See Perkins*, 648 F.3d at 899.  With regard to Johnson's opinion, her statements in the Medical Impairment Questionnaire indicated that Welsh was haggard, could not calm herself, had a disrupted sleep cycle, and looked visibly distressed. (Tr. 404.)  However, Johnson's treatment notes show that when Welsh was taking medication, she "didn't look nearly as haggard," she laughed with her granddaughter, her anxiety and sleep were "a little better," she was nicely groomed and dressed, her thoughts were appropriate, she was more cheerful, and overall she was improving. (Tr. 343, 353, 357, 359, 360, 369, 424-26, 591-92.)  These notes are further supported with other substantial evidence in the record, including the opinions of Milne (tr. 375-93) and Newman (tr. 415-16), as well as Welsh's daily activities (*see* tr. 219-23).  Indeed, mental impairments that are

22

controllable or amenable to treatment do not support a finding of disability. *Davidson v. Astrue*, 578 F.3d 838, 846 (8th Cir. 2009); *see also Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007)* (concluding that when impairment is controlled by medication or treatment, it cannot be considered disabling).

With regard to Hartman's opinion, he stated in the General Questionnaires that Welsh had depression, anxiety, trouble concentrating, and Bipolar Disorder. (Tr. 420, 423, 596, 598.) These General Questionnaires are the same Questionnaires that the ALJ discounted with regard to Welsh's physical limitations (discussed above). Moreover, the ALJ noted that Hartman's treatment notes contained no detailed examination finding related to psychiatric symptoms. (*See* Tr. 21, 316-40, 409-11, 447-51, 589.)

In short, the ALJ's decision to discount Johnson's opinion in the Medical Impairment Questionnaire and Hartman's opinion in the General Questionnaires is supported by substantial evidence on the record as a whole. *See* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) (providing that the ALJ should consider the extent to which a doctor's opinion is supported by objective evidence); *Estes¸* 275 F.3d at 725 (an ALJ may reject any medical expert opinion that is inconsistent with the record as a whole).

### 4. *Listing Criteria*

Welsh argues that her impairments satisfy Listing 12.04's paragraph B criteria. (Filing 14 at CM/ECF p. 11; Filing 23 at CM/ECF pp. 1-2.) To satisfy listing 12.04's paragraph B criteria, Welsh had to show that her mental impairments resulted in at least two of the following: (1) marked restriction in activities of daily living, (2) marked difficulties in maintaining social functioning, (3) marked difficulties in maintaining concentration, persistence, or pace, and (4) repeated episodes of decompensation. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.

To support her argument, Welsh relies on Johnson's opinion, which indicates that she suffers from marked restriction in activities of daily living and extreme difficulty maintaining social functioning and concentration, persistence, or pace, and that she had experienced four or more episodes of decompensation. (Filing 14 at CM/ECF p. 11; Filing 23 at CM/ECF pp. 1-2; Tr. 406.) However, the ALJ afforded Johnson's opinion "no weight," and concluded that Welsh did not satisfy 12.04 because her affective and anxiety disorders resulted in only mild limitation in activities of daily living; moderate limitation in social functioning and concentration, persistence, and pace; and no episodes of decompensation. (Tr. 13-14, 20-21.) As discussed above, the ALJ's decision to discount Johnson's opinion was supported by substantial evidence on the record as a whole; that decision extends to the ALJ's conclusion that Welsh's impairments do not satisfy Listing 12.04's paragraph B criteria. *See, e.g., Myers v. Colvin*, 721 F.3d 521, 526 (8th Cir. 2013) (concluding the ALJ properly found claimant did not satisfy Listing 12.04's paragraph B criteria where treating physician's mental functioning limitations were not given controlling weight and where the ALJ considered all mental evaluations of record).

### 5.   Improper Standard

Welsh argues the ALJ erred in concluding she could perform other substantial gainful activity in the economy because he only considered whether she could perform any "other work." (Filing 14 at CM/ECF pp. 4-5.) Welsh asserts that "this standard imposed too high a burden of proof on [] Welsh and warrants reversal." (*Id.* at CM/CF p. 5.)

The Commissioner acknowledges that the ALJ, when explaining the last step of the sequential evaluation process, wrote that he was determining whether Welsh could perform any "other work" in the economy, and not whether she could perform "other substantial gainful activity." (Tr. 11; Filing 22 at CM/ECF p. 35.) However, the ALJ also set forth the proper definition of disability in his opinion:

24

> Disability is defined as the inability to engage in *any substantial gainful activity* by reason of any medically determinable physical or mental impairment or combination of impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

(Tr. 9 (emphasis added).) *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).  It is hard to fault the ALJ for typing the term "other work" when the continued definitions of disability within the regulations also use the term "other work."  *See* 20 C.F.R. §§ 404.1505(a), 416.905(a) ("If we find that you cannot do your past relevant work, we will use the same residual functional capacity assessment and your vocational factors of age, education, and work experience to determine if you can do *other work*." (emphasis added)).  Nevertheless, the last step of the ALJ's analysis is supported by substantial evidence because it is based on vocational expert testimony stemming from a hypothetical that included Welsh's age, education, work experience, and residual functional capacity.  (Tr. 14-15, 18, 22, 55-57.)  *See Buckner v. Astrue*, 646 F.3d 549, 561-62 (8th Cir. 2011) (citing *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010) (vocational expert testimony constitutes substantial evidence when based on a hypothetical that accounts for all of the concrete consequences of claimant's credible impairments).

## IV.  CONCLUSION

For the reasons explained above, I find the ALJ's decision is supported by substantial evidence on the record as a whole and is not contrary to law.

Accordingly,

IT IS ORDERED that the decision of the Commissioner is affirmed pursuant to sentence four of 42 U.S.C. § 405(g).  Final judgment will be entered by separate document.

DATED this 18th day of December, 2014.

BY THE COURT:

*Richard G. Kopf*
Senior United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.

26